[Cite as *State ex rel. Food & Water Watch & FreshWater Accountability Project v. State*, 2016-Ohio-3135.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. Food and Water Watch and FreshWater Accountability Project, | : | |
| Relators, | : | No. 14AP-958 |
| v. | : | (REGULAR CALENDAR) |
| State of Ohio et al., | : | |
| Respondents. | : | |

D E C I S I O N

Rendered on May 24, 2016

**On brief:** *Terry J. Lodge,* for relators.

**On brief:** *Michael DeWine*, Attorney General, *Ryan L. Richardson* and *Sarah E. Pierce,* for respondents Governor John R Kasich and the State of Ohio; *Brett A. Kravitz* and *Daniel J. Martin,* for respondents James Zehringer, director of the Ohio Department of Natural Resources (ODNR) and Rick Simmers, chief of ODNR's Division of Oil and Gas Resources Management.

**On brief:** *Steptoe & Johnson PLLC, J. Kevin West, Lyle B. Brown* and *Katerina E. Milenkovski,* for intervenors Chesapeake Exploration, L.L.C., and Antero Resources Corporation.

IN MANDAMUS
ON OBJECTION TO THE MAGISTRATE'S DECISION

LUPER SCHUSTER, J.

{¶ 1}  Relators, Food and Water Watch ("FWW") and FreshWater Accountability Project ("FWAP"), filed this original action against four respondents:  (1) State of Ohio, (2) Governor John R. Kasich, (3) James Zehringer, the director of the Ohio Department of

Natural Resources ("ODNR"), and (4) Rick Simmers, chief of ODNR's Division of Oil and Gas Resources Management ("chief"). Relators request a writ of mandamus ordering respondents to promulgate rules as provided by R.C. 1509.22(C) and to nullify and vacate all orders the chief has issued.

{¶ 2} The court referred this matter to a magistrate pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals. In December 2014, respondents filed a motion to dismiss. On February 4, 2015, Chesapeake Exploration, L.L.C., and Antero Resources Corporation ("intervenors") moved for leave to intervene pursuant to Civ.R. 24, and the magistrate granted that request. On February 27, 2015, relators filed a motion for summary judgment; in March 2015, intervenors moved for summary judgment; and in April 2015, respondents moved for summary judgment.

{¶ 3} In January 2016, the magistrate issued the appended decision, including findings of fact and conclusions of law. The magistrate concluded relators lack standing to bring this action and, therefore, recommended this court deny relators' motion for summary judgment, grant intervenors' motion for summary judgment, grant respondents' motion for summary judgment, and find as moot respondents' motion to dismiss. Relators have filed an objection to the magistrate's decision and argue the magistrate erroneously determined they lack standing to bring this action.

{¶ 4} Following our independent review of the record pursuant to Civ.R. 53, we find the magistrate properly applied the salient law to the pertinent facts. Relators' memorandum in support of their objection simply reasserts the claims regarding standing that the magistrate rejected in his well-reasoned decision. We adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein.[1]

---

[1] The magistrate's decision cites *State ex rel. Walgate v. Kasich*, 10th Dist. No. 12AP-548, 2013-Ohio-946, as authority regarding the principles of organizational standing and public-right standing. After the magistrate issued his decision, the Supreme Court of Ohio affirmed in part and reversed in part this court's judgment. *State ex rel. Walgate v. Kasich*, __ Ohio St.3d __, 2016-Ohio-1176. *Walgate* involved the standing of various plaintiffs challenging gambling-related legislation and rules in Ohio. The Supreme Court reversed this court's judgment only to the extent this court affirmed the dismissal of the equal protection claim of one of the individual plaintiffs due to the plaintiff's lack of standing. *Id.* at ¶ 52. That plaintiff alleged he would engage in casino gaming but for an allegedly unconstitutional limitation. *Id.* at ¶ 45. The Supreme Court found he had sufficiently alleged traditional standing. *Id.* at ¶ 50. The Supreme Court otherwise affirmed this court's judgment. *Id.* at ¶ 52. Therefore, the magistrate's citation to this court's decision in *Walgate* remains appropriate.

{¶ 5}  Accordingly, we overrule relators' objection to the magistrate's decision, deny relators' motion for summary judgment, grant intervenors' motion for summary judgment, grant respondents' motions for summary judgment, and find as moot respondents' motion to dismiss.  The requested writ of mandamus is therefore denied.

*Objection overruled;*
*writ of mandamus denied.*

SADLER, J., concurs.
DORRIAN, P.J., concurs in part and concurs in judgment.


DORRIAN, P.J., concurring in part and concurring in judgment.

{¶ 6}  I concur with the majority and would adopt the magistrate's decision with respect to the magistrate's conclusion that Wilkins and the Castles lack standing.

{¶ 7}  I concur separately with the majority and would adopt the magistrate's decision with respect to the magistrate's conclusion that Mshar lacks standing.  However, I would not adopt the magistrate's conclusion at ¶ 90 of the appended magistrate's decision which states:

> Returning to the affidavit of Cheryl Mshar, there is no expert opinion or evidence to support the inference that the so-called "hydrocarbon stenches" that she allegedly has smelled since 2014 are in fact causing her harm or injury.

{¶ 8}  Ohio courts, including the Supreme Court of Ohio, have ruled that an offensive odor or stench can constitute an injury for purposes of a nuisance claim.  *See, e.g.*, *Banford v. Aldrich Chem. Co.*, 126 Ohio St.3d 210, 2010-Ohio-2470, ¶ 26 (referring to cases awarding damages for annoyance and discomfort affecting a person's senses, including discharge of soot, smoke, or gases onto neighboring property); *Kepler v. Indus. Disposal Co.*, 84 Ohio App. 80 (9th Dist.1948) (holding that plaintiffs established an actionable nuisance claim where the defendant was engaged in burning industrial waste, resulting in noxious smoke and odors that at times enveloped the plaintiffs' properties); *Reifsnyder v. Canton Fertilizer & Chem. Co.*, 9 Ohio App. 161, 166 (5th Dist.1918) ("[A] use [of property] which produces injurious and destructive vapors, smokes and noxious odors, causing an annoyance to property owners in the neighborhood, is such an annoyance as will authorize a court of equity to act and grant the proper relief."); *Letts v.*

*Kessler*, 54 Ohio St. 73, 82 (1896), citing Broom's Legal Maxims, 372 ("If smoke, gas, offensive odors, or noise pass from one's own premises to or upon the premises of another to his injury, an action will lie therefor, even though the smoke, gas, odor or noise should be caused by the lawful business operations of defendant and with the best of motives."). While I acknowledge that the claim in the case before us sounds in mandamus rather than nuisance, case law cited above persuades me that the principal that an offensive odor/stench may constitute an injury is applicable here as well.

{¶ 9}   Furthermore, the magistrate points to no authority that expert opinion or even evidence other than Mshar's own sworn statement would be required to establish that a stench constitutes an injury for purposes of standing.  As noted by the magistrate, this court has stated that standing requires a showing of a "direct and concrete injury in a manner or degree different from that suffered by the public in general." *Bowers v. State Dental Bd.*, 142 Ohio App.3d 376, 380 (10th Dist.2001).  Furthermore, the injury must be palpable and not merely speculative.  *State ex rel. Walgate v. Kasich*, 10th Dist. No. 12AP-548, 2013-Ohio-946, ¶ 11.  At ¶ 5 of her affidavit, Mshar stated: "I can smell hydrocarbon stenches from the plant."  Stench is defined as "a very bad smell" or "a characteristic repugnant quality."  http://www.merriam-webster.com/dictionary/stench (assessed May 19, 2016).  An expert nose is not required to discern a very bad smell.   In addition, Mshar's proximity to the plant makes the stench different from that suffered by the public in general.

{¶ 10} Nevertheless, although I disagree with the magistrate and the majority regarding whether Mshar established that she suffered an injury sufficient for purposes of standing, I concur that she did not establish redressability for purposes of standing. Mshar did not allege how administrative rules, rather than the existing Chief's orders, would redress the injury.

{¶ 11}  Accordingly, I respectfully concur in part and concur in judgment.

_____

<u>APPENDIX</u>

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel.<br>Food and Water Watch<br>and FreshWater Accountability Project, | : | |
| | : | |
| Relators, | : | |
| v. | : | No. 14AP-958 |
| State of Ohio, et al. | : | (REGULAR CALENDAR) |
| Respondents. | : | |

### M A G I S T R A T E ' S   D E C I S I O N

**Rendered on January 14, 2016**

*Terry J. Lodge,* for relators.

*Michael DeWine,* Attorney General, *Ryan L. Richardson* and *Sarah E. Pierce,* for respondents Governor John R Kasich and the State of Ohio; *Brett A. Kravitz* and *Daniel J. Martin,* for respondents James Zehringer, director of the Ohio Department of Natural Resources (ODNR) and Rick Simmers, chief of ODNR's Division of Oil and Gas Resources Management.

*Steptoe & Johnson PLLC, J. Kevin West, Lyle B. Brown* and *Katerina E. Milenkovski,* for intervenors Chesapeake Exploration, L.L.C. and Antero Resources Corporation.

### IN MANDAMUS

ON RESPONDENTS' DECEMBER 23, 2014 MOTION TO DISMISS

ON RELATORS' FEBRUARY 27, 2015 MOTION FOR SUMMARY JUDGMENT

ON INTERVENORS' MARCH 12, 2015 MOTION FOR SUMMARY JUDGMENT

ON RESPONDENTS' APRIL 28, 2015 MOTIONS FOR SUMMARY JUDGMENT

{¶ 12} In this original action, the relators, Food and Water Watch ("FWW") and FreshWater Accountability Project ("FWAP") request that a writ of mandamus issue against four named respondents:  (1) State of Ohio, (2) Governor John R. Kasich, (3) James Zehringer, the Director of the Ohio Department of Natural Resources ("ODNR"), and (4) Rick Simmers, Chief of ODNR's Division of Oil and Gas Resources Management. This action involves the alleged failure of Chief Simmers to promulgate administrative rules pursuant to R.C. 1509.22(C).

Findings of Fact:

{¶ 13} 1. On November 19, 2014, the relators filed a complaint for a writ of mandamus.

### The Complaint

{¶ 14} According to the complaint, FWW is a non-profit organization that allegedly "advocates for common sense policies that will result in healthy, safe food and access to safe and affordable drinking water."  (Complaint, ¶ 9.)

{¶ 15} According to the complaint, FWAP is a non-profit organization that allegedly "seeks to force corporations and governmental officials to be directly responsible and responsive to the public on energy issues which impair the commons of water and land resources."  (Complaint, ¶ 10.)

### Relevant Statutes Identified in the Complaint

{¶ 16} R.C. 1509.03(A) provides:

> The chief of the division of oil and gas resources management shall adopt, rescind, and amend, in accordance with Chapter 119. of the Revised Code, rules for the administration, implementation, and enforcement of this chapter.

{¶ 17} R.C. 1509.22(B)(2)(a) provides:

> On and after January 1, 2014, no person shall store, recycle, treat, process, or dispose of in this state brine or other waste

substances associated with the exploration, development, well stimulation, production operations, or plugging of oil and gas resources without an order or a permit issued under this section * * *.

{¶ 18} R.C. 1509.22(C) provides:

The chief shall adopt rules regarding storage, recycling, treatment, processing, and disposal of brine and other waste substances. The rules shall establish procedures and requirements in accordance with which a person shall apply for a permit or order for the storage, recycling, treatment, processing, or disposal of brine and other waste substances that are not subject to a permit issued under section 1509.06 or 1509.21 of the Revised Code and in accordance with which the chief may issue such a permit or order.

## Attachments to the Complaint

{¶ 19} Attached to the complaint as exhibit A is a list of 23 entities that have each received from Chief Simmers a written order for temporary authorization to operate a facility pursuant to R.C. 1509.22. These 23 "chief's orders" were allegedly issued within the first 180 days of 2014.

{¶ 20} Attached to the complaint as exhibit E is order number 2014-52 issued by Chief Simmers to Industrial Waste Control/Ground Tech, Inc. ("Ground Tech") for temporary authorization to operate a facility located at Youngstown, Ohio pursuant to R.C. 1509.22. The chief's order is dated March 6, 2014.

{¶ 21} Attached to the complaint as exhibit F is order number 2014-08 issued by Chief Simmers to EnerGreen 360 Holding Company LLC ("EnerGreen") for temporary authorization to operate a facility in Warren Township, Belmont County, Ohio. The chief's order is dated January 3, 2014.

{¶ 22} No chief's order is submitted with the complaint with respect to the remaining 21 other entities listed at exhibit A.

## Return to Body of the Complaint

{¶ 23} According to the complaint, Cheryl Mshar resides in Youngstown, Ohio within .8 miles of the Ground Tech facility. She is a member of FWW and FWAP.

{¶ 24} According to the complaint, Hattie Wilkins resides in Youngstown, Ohio within .74 miles of the Ground Tech facility.  She is also a member of FWW and FWAP.

{¶ 25} According to the complaint, Cheryl Mshar:

> [B]elieves that she presently is breathing air which contains chemical and/or radioactive contamination from the Ground Tech plant and that she and her friends and families are threatened with physical harm by unmeasured and unmonitored routine pollutants and radiation being released from the Ground Tech facility into air and water.

(Complaint, ¶ 11.)

{¶ 26} Allegedly, Cheryl Mshar is an Ohio taxpayer:

> [W]ho objects to violations of Ohio law which potentially subject the State of Ohio to fiscal liability for misfeasance and malfeasance in the form of inadequate and unlawful regulatory actions.

(Complaint, ¶ 11.)

{¶ 27} According to the complaint, Hattie Wilkins also believes that she and her friends and family are breathing air containing "chemical and/or radioactive contamination from the Ground Tech plant" and that they are "threatened with physical harm."  (Complaint, ¶ 12.)  Allegedly, Hattie Wilkins is an Ohio taxpayer "who objects to violations of Ohio law which potentially subject the State of Ohio to fiscal liability for misfeasance and malfeasance in the form of inadequate and unlawful regulatory actions."  (Complaint, ¶ 12.)

{¶ 28} According to the complaint, FWAP members David Barton Castle and Bobbie Sue Castle reside, conduct business, and recreate some 1.7 miles south of the "proposed" EnerGreen facility.  (Complaint, ¶ 14.)  The Castle's allegedly:

> [B]elieve that if the EnerGreen dumpsite is allowed to be [sic] operate under the ODNR Chief's Order as issued that they will be exposed to air and water contaminated with chemical and radiological emissions from the facility, and that their physical health and that of their friends and family will be threatened by such unmeasured and unmonitored pollutants and radiation.

(Complaint, ¶ 14.)

{¶ 29} The Castles are allegedly Ohio taxpayers who also object to alleged violations of Ohio law as do Cheryl Mshar and Hattie Wilkins.

{¶ 30} According to the complaint, the chief's orders issued to the 23 entities on the list were unlawfully issued because of the chief's alleged failure to promulgate the administrative rules provided by R.C. 1509.22(C).

{¶ 31} Therefore, the complaint requests that this court issue a writ of mandamus ordering respondents to promulgate rules as provided by R.C. 1509.22(C). In the meantime, the relators "further pray the court immediate[ly] enjoin, nullify and revoke and cancel all Chief's Orders issued to date as being fatally unlawful." (Complaint, last paragraph.)

## Respondents' Motion to Dismiss

{¶ 32} 2. On December 23, 2014, respondents filed their motion to dismiss the complaint. In their memorandum in support, respondents argued that relators lack standing to bring this action. Respondents also argue that this court lacks jurisdiction because allegedly the real object of the action is declaratory judgment and prohibitory injunction.

{¶ 33} 3. On January 12, 2015, relators filed a memorandum contra respondents' motion to dismiss. In support, relators submitted the affidavit of Cheryl Mshar executed December 30, 2014, the affidavit of Hattie Wilkins executed January 5, 2015, and the affidavit of David Barton Castle and Bobbie Sue Castle executed jointly on January 10, 2015.

{¶ 34} 4. In her affidavit, Mshar averred:

> [One] I live at 1928 Donald Avenue in Youngstown, Ohio. I am an Ohio taxpayer, paying property, income and sales taxes.
>
> [Two] I am a member of two nonprofit organizations, Food and Water Watch and the FreshWater Accountability Project. Both organizations advocate for a ban on industrial waste handling by IWC/Ground Tech in Youngstown which is derived from horizontal hydraulic fracturing for oil and gas ("fracking"), on the ground that it is unsafe and poses a threat to public health.

[Three] I own my home on Donald Avenue. A map of the area in which I live in Youngstown accompanies this Affidavit, and shows that my house is .82 of a mile - about eight tenths of a mile - from the IWC/Ground Tech plant.

[Four] I have read the IWC/Ground Tech application for its March 6, 2014 Chief's Order * * *. The facility services include the handling of radioactive fracking wastes, performing radiological waste characterization, tank cleaning and decontamination, waste solidification, brine storage, and preparation of drilling wastes for disposal. The Chief of the Ohio Department of Natural Resources did not require IWC/Ground Tech to provide any information about the air or water emission volumes, toxicity or hazards of the chemical and radioactive wastes and processes to which my family, friends and I will be exposed during routine operations at the facility. I conclude that the drilling wastes handled, blended and disposed of at IWC/Ground Tech will be at least as contaminated, if not more, with chemicals and radiation as they are when generated during horizontal hydraulic fracking operations.

[Five] On a near-daily basis, I see trucks with large rolloff tanks, and tank trucks, coming to and from the IWC/Ground Tech plant. They drive on streets within several blocks of my home. I can smell hydrocarbon stenches from the plant, a smell which I first noticed in 2014 after the company received its Chief's Order. I am routinely forced to breathe polluted air. I have learned that there is no state or federal Clean Air Act permit which governs airborne emissions from IWC/Ground Tech's fracking waste facility.

[Six] I oppose hydraulic fracturing to obtain oil and gas in part because fracking threatens our water supplies and our air with pollution by toxic chemicals and radiation, and produces large volumes of toxic industrial waste. After reading the Chief's Order issued by Ohio Department of Natural Resources for IWC/Ground Tech, I see no provisions which require the company to contain vapors and airborne emissions from the wastes, no requirements to clean up accidental spills of fracking waste material on nearby streets, nor restrictions which state what types of waste may be disposed of within Ohio, and/or under what conditions. I oppose the granting of Chief's Order No. 2014-52 for the operation of the IWC/Ground Tech drilling waste disposal facility in Youngstown because it doesn't regulate operations in any way, not even to hold the company to perform the

processes and dispose of wastes as described in the application.

[Seven] Living close by IWC/Ground Tech, I believe that my family, friends, and I are being involuntarily exposed to, and are breathing, chemically-polluted and radon-polluted air emitted from fracking waste delivered to or held at the facility as a part of routine operations. I believe that my family, friends and I will be [sic] continue to be involuntarily exposed to chemical and radioactive air pollution, and will have to breathe such in the event there are waste spills from trucks traveling to and from IWC/Ground Tech on streets closer to my home than the IWC/Ground Tech facility. I also believe that my family, friends and I will be involuntarily exposed to chemical and radioactive contamination, both airborne and waterborne, in the event of a spill into the Mahoning River, which runs near the facility and near my home.

[Eight] I believe that even if air and water pollution are the result from routine operations, they subject my family, visiting friends and me to unnecessary risks to personal health.

{¶ 35} 5.  In her affidavit, Wilkins avers at paragraphs one through seven:

[One] I live at 733 Fairmont Avenue in Youngstown, Ohio. I am an Ohio taxpayer, paying property, income and sales tax.

[Two] I am a member of two nonprofit organizations, Food and Water Watch and the FreshWater Accountability Project. Both organizations advocate for a ban on industrial waste handling by IWC/Ground Tech in Youngstown which comes from horizontal hydraulic fracturing for oil and gas ("fracking"), on the ground that it is unsafe and poses a threat to public health.

[Three] I own my home on Fairmont Avenue. A map of the area in which I live in Youngstown accompanies this Affidavit, and shows that my house is .74 of a mile - about three quarters of a mile - from the IWC/Ground Tech plant.

[Four] I have read the IWC/Ground Tech application for its March 6, 2014 Chief's Order * * *. The facility services include the handling of radioactive fracking wastes, performing radiological waste characterization, tank cleaning and decontamination, waste solidification, brine

storage, and preparation of drilling wastes for disposal. The Chief of the Ohio Department of Natural Resources did not require IWC/Ground Tech to provide any information about the air or water emission volumes, toxicity or hazards of the chemical and radioactive wastes and processes to which my family, friends and I will be exposed during routine operations at the facility. I conclude that the drilling wastes handled, blended and disposed of at IWC/Ground Tech will be at least as contaminated, if not more, with chemicals and radiation as they are when generated during horizontal hydraulic fracking operations.

[Five] I oppose hydraulic fracturing to obtain oil and gas in part because fracking threatens our water supplies and our air with pollution by toxic chemicals and radiation, and produces large volumes of toxic industrial waste. After reading the Chief's Order issued by Ohio Department of Natural Resources for IWC/Ground Tech, I see no provisions which require the company to contain vapors and airborne emissions from the wastes, no requirements to clean up accidental spills of fracking waste material on nearby streets, nor restrictions which state what types of waste may be disposed of within Ohio, and/or under what conditions. I oppose the granting of Chief's Order No. 2014-52 for the operation of the IWC/Ground Tech drilling waste disposal facility in Youngstown because it doesn't regulate operations in any way, not even to hold the company to perform the processes and dispose of wastes as described in the application.

[Six] Living close by IWC/Ground Tech, I believe that my family, friends, and I are being involuntarily exposed to, and are breathing, chemically-polluted and radon-polluted air emitted from fracking waste delivered to or held at the facility as a part of routine operations. I believe that my family, friends and I will be [sic] continue to be involuntarily exposed to chemical and radioactive air pollution, and will have to breathe such in the event there are waste spills from trucks traveling to and from IWC/Ground Tech on streets closer to my home than the IWC/Ground Tech facility. I also believe that my family, friends and I will be involuntarily exposed to chemical and radioactive contamination, both airborne and waterborne, in the event of a spill into the Mahoning River, which runs near the facility and near my home.

[Seven] I believe that even if air and water pollution are the result from routine operations, they subject my family, visiting friends and me to unnecessary risks to personal health.

{¶ 36} 6.  In their affidavit, the Castles aver at paragraphs 1 through 15:

[One] We are adult residents of Ohio, are married to one another, and live at 416 North Chestnut Street in Barnesville, Ohio 43713.

[Two] We each are members of the FreshWater Accountability Project, which opposes the development of the EnerGreen 360 fracking waste dump proposed to be built a short distance north of Barnesville, on the ground that the dump would be unsafe and pose a threat to public health.

[Three] We own our home on North Chestnut Street, which is about 1.7 miles south of the proposed site of the EnerGreen 360 dump north of Barnesville. We routinely run errands, visit friends, attend civic functions, and maintain and live in our home in Barnesville.

[Four] We have read the EnerGreen 360 application for the Chief's Order which is the subject of this lawsuit * * *. We are very concerned for our health and that of our family members in the Barnesville area in connection with the planned EnerGreen oil and gas drilling waste treatment facility, slated to set up operations on Belmont County Port Authority land north of Barnesville. The proposal involves the dumping of a blend of fracking waste and coal ash or other industrial wastes on bare ground, without monitoring wells, to create a flat, 200 acre industrial park site by filling in a valley with exposed surface waters running through it. There will be no protective landfill liners and no means of assessing what toxins are carried offsite by rainwater or snow melt.

[Five] Neither the EnerGreen application nor the Chief's Order from the Ohio Department of Natural Resources provide for monitoring of air or water quality, nor does the chief's Order require any state or federal permits required by the federal Clean Air or Clean water Acts. We know that oil and gas drilling wastes will contain heavy metals, radioactive elements including radium, thorium, uranium and will emit radon gas. We are concerned that chemicals used to extract oil and gas from shale during hydraulic fracturing (called

"fracking") will contaminate the drilling wastes at EnerGreen, and that various chemical poisons will become airborne and be breathed by us and members of our family who live, work and conduct business in and around Barnesville.

[Six] EnerGreen proposes the dumping of up to 60,000 tons per year of oil and gas drilling wastes blended with coal ash and/or other poisonous or hazardous materials and toxic wastes.

[Seven] In the past several years we have observed the spread of horizontal hydraulic fracturing for oil and gas in the vicinity of Barnesville. We are familiar with the industrial chemical odors and taste in the mouth from driving in areas where fracking wells are being developed. We've seen flaring wells and breathed the toxic air downwind from them in the vicinity of Barnesville.

[Eight] Prior to our becoming parties to this case, we read and saw evidence of waste problems from fracking, including chemically-contaminated drilling wastes being poured into pits, or being injected under high pressure underground. We also know about the practice of "downblending," where fracking waste is mixed with other material so it can supposedly be reduced enough in its radioactivity or chemical toxicity to be disposed of in landfills.

[Nine] Although we question the wisdom of disposing of fracking waste in licensed landfills, at least licensed landfills have liners and other engineered features to provide some protection to groundwater and surface water supplies, and to people. According to the application for the Chief's Order in this case, fracking waste will be mixed with coal ash and the resulting blend will be dumped in a place with no liners, no monitoring wells, no leachate collection systems - in short, without any of the features one might find in a licensed landfill. Coal ash is required by Ohio law to be disposed of in a licensed landfill, but EnerGreen will not be operating a licensed landfill. We see nothing in their application that suggests the heavy metals or mercury or concentrated radiation in coal ash will be neutralized, removed or rendered nondangerous. Fracking waste also contains heavy metals and radium. Even if EnerGreen can be believed that they will only be disposing of "vertical cuttings" from oil and gas drilling, those cuttings will inevitably contain heavy metals and radiation. Radium, one of the radiation sources,

easily moves around in water. From the lack of concern for toxicity apparent from the application, we conclude that the EnerGreen dump won't use the practice of "daily cover" to top off the waste being dumped on the ground to slow down penetration by rainfall or snow melt. Water will freely penetrate the growing pile of waste, it appears, and will also move radiation into the ground or across the land surface into water supplies. The lack of daily cover also will allow radon gas to freely escape from the pile.

[Ten] With no measures to stop particles of waste, chemicals, heavy metals and radioactive solid matter and gas from being blown offsite from EnerGreen, and nothing to stop runoff of heavy metals and radiation into water sources, we are both concerned that the wind and water will deposit toxic and radioactive materials throughout Barnesville and into the Barnesville Reservoir which is south of town.

[Eleven] From our investigation before becoming parties to this case, we know that thousands of tons per year of radioactive drill cuttings are landfilled in Pennsylvania, and that regulators there do not have a very good handle on the problem of getting rid of radioactive fracking wastes. And we believe the situation is even worse in Ohio, where naturally-occurring radioactive material, called "NORM," is completely unregulated and may be disposed of anywhere without notice, air or water monitoring, or the maintenance of records, even though NORM might contain high levels of radium and other radioactive isotopes, and emit radon gas.

[Twelve] The EnerGreen application says of radiological hazards of the thousands of tons of fracking wastes that will be brought onto the site, only that incoming loads will be "scanned" for radiation. * * * There is no disclosure of what scanning device will be used, nor a justification of its accuracy, nor is there any mention of what the anticipated range of the radioactive elements and radiotoxicity might be. Radium, the major radioactive element, is an alpha wave emitter, and we see no indication of how radium will be identified.

[Thirteen] The Chief's Order issued by ODNR provides for no identification of radioactivity in the EnerGreen waste receipts. It doesn't even legally require EnerGreen to do whatever vaguely-referenced testing the company plans to do.

[Fourteen] The EnerGreen application does not mention radon gas nor any other emissions, yet the material will contain radiation and oil-based substances and there are no arrangements to limit or control emissions of airborne contaminants and radon gas.

[Fifteen] EnerGreen's application states that the company will only accept "air cuttings," and that the material will also contain "refined oil-based substances." There is no explanation of how "air cuttings" will be distinguished from drilling material resulting from horizontal drillings in the fracking wells, which may be identical in visual appearance to vertical cuttings. The application states * * * that "material that does not meet the regulatory requirements will be disposed at the landfill." So EnerGreen fully expects to receive drilling wastes above and beyond vertical air cuttings," but gives no explanation of how unacceptable material will be identified and separated from acceptable material.

{¶ 37} 7. On January 22, 2015, respondents filed their reply in support of their motion to dismiss. In their reply, respondents suggest that it would be inappropriate for this court to consider the affidavits on a motion to dismiss. Also, respondents assert that the affiants "merely restate the conclusory and highly speculative allegations of harm set forth in the complaint." (Reply, 13.)

### The Motion to Intervene

{¶ 38} 8. On February 4, 2015, pursuant to Civ.R. 24, a motion to intervene was filed by Chesapeake Exploration, LLC ("Chesapeake") and Antero Resources Corporation ("Antero"). With their motion to intervene, Chesapeake and Antero filed a memorandum supplementing the respondents' December 23, 2014 motion to dismiss.

{¶ 39} 9. On February 20, 2015, the relators filed their memorandum contra the motion to intervene. On March 2, 2015, Chesapeake and Antero filed a reply.

{¶ 40} 10. On April 1, 2015, the magistrate issued an order finding that Chesapeake and Antero have met the requirements of Civ.R. 24(B)(2) for permissive intervention. Thus, the magistrate's order grants the motion to intervene.

**The Motions for Summary Judgment**

{¶ 41} 11.  Earlier, on February 27, 2015, relators moved for summary judgment.

{¶ 42} 12.  On March 9, 2015, respondents moved to stay briefing on relators' summary judgment motion pending the magistrate's ruling on respondents' motion to dismiss.

{¶ 43} 13.  On March 12, 2015, prior to the magistrate's order granting intervention, the applicants for intervention (Chesapeake and Antero) filed their own motion for summary judgment.  Chesapeake and Antero also filed their written response to relators' motion for summary judgment.  Chesapeake and Antero also moved for leave to file their motion for summary judgment.

{¶ 44} 14.  On April 2, 2015, relying on Civ.R. 56(A), the magistrate issued an order denying respondents' March 9, 2015 motion to stay briefing on relators' February 27, 2015 motion for summary judgment.

{¶ 45} 15.  On April 2, 2015, the magistrate issued notice of summary judgment hearing.  Notice was given that the motions for summary judgment filed by relators and intervenors are set for submission to the magistrate on April 21, 2015.

{¶ 46} 16.  On April 8, 2015, the magistrate issued an order granting the March 12, 2015 motion of Chesapeake and Antero for leave to file their motion for summary judgment and their response to the relators' motion for summary judgment. The magistrate amended the April 2, 2015 notice of summary judgment hearing such that the motions for summary judgment were set for submission to the magistrate on April 28, 2015.

{¶ 47} 17.  On April 9, 2015, the relators' moved for leave to respond in opposition to intervenors' motion for summary judgment.  The magistrate granted relators' motion, but the submission date for the motions for summary judgment remained at April 28, 2015.

{¶ 48} 18.  On April 28, 2015, respondents Governor Kasich and the State of Ohio moved for summary judgment.  They also filed a memorandum contra the relators' motion for summary judgment.

{¶ 49} 19. Also on April 28, 2015, respondents Zehringer and Chief Simmers moved for summary judgment. Respondents also filed a memorandum in opposition to the relators' motion for summary judgment.

{¶ 50} 20. On May 5, 2015, the magistrate issued an order giving notice that the two motions for summary judgment filed on April 28, 2015 are set for submission to the magistrate on May 22, 2015.

{¶ 51} 21. On May 22, 2015, the relators filed a memorandum contra the April 28, 2015 motion for summary judgment filed by Zehringer and Chief Simmers.

{¶ 52} 22. Also on May 22, 2015, Chesapeake and Antero filed a memorandum in support of respondents' motions for summary judgment.

Conclusions of Law:

{¶ 53} The issue is whether relators have standing to litigate the consequences of the alleged failure to promulgate administrative rules under R.C. 1509.22(C) by Chief Simmers. The object of this original action is twofold: (1) to compel Chief Simmers to promulgate rules under R.C. 1509.22(C), and (2) to compel Chief Simmers to rescind the chief's orders he issued to the 23 named entities, including the intervenors.

{¶ 54} Finding that relators lack standing to bring this action, it is the magistrate's decision that this court grant the motions for summary judgment filed by the respondents and the intervenors, and that this court deny relators' motion for summary judgment. The respondents' motion to dismiss is thereby rendered moot.

## The Law of Standing: Traditional Standing

{¶ 55} Before an Ohio court can consider the merits of a legal claim, the person or entity seeking relief must establish standing to sue. *Ohio Pyro, Inc. v. Ohio Dept. of Commerce, Div. of State Fire Marshal,* 115 Ohio St.3d 375, 2007-Ohio-5024,¶ 27.

{¶ 56} Traditional standing principles require the plaintiffs to show that they have suffered (1) an injury that is, (2) fairly traceable to the defendant's allegedly unlawful conduct, and (3) likely to be redressed by the requested relief. *Moore v. City of Middletown,* 133 Ohio St.3d 55, 2012-Ohio-3897, ¶ 22, citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992). "These three factors—injury, causation, and

redressability—constitute 'the irreducible constitutional minimum of standing.' " *Id.* at ¶ 22, quoting *Lujan* at 560. *See ProgressOhio.org, Inc. v. JobsOhio,* 139 Ohio St.3d 520, 2014-Ohio-2382, ¶ 7.

{¶ 57} Standing depends upon whether the party has alleged such a personal stake in the outcome of the controversy as to ensure that the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution. *Clifton v. Village of Blanchester,* 131 Ohio St.3d 287, 2012-Ohio-780, ¶ 15; *ProgressOhio.org, Inc.* at ¶ 7.

{¶ 58} An association has standing to bring a lawsuit on behalf of its members when (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *State ex rel. Walgate v. Kasich,* 10th Dist. No. 12AP-548, 2013-Ohio-946, ¶ 15, citing *League of United Latin Am. Citizens v. Ohio Governor,* 10th Dist. No. 10AP-639, 2012-Ohio-947, ¶ 20.

{¶ 59} The injury is not required to be economic, but it must be palpable. *Walgate* at ¶ 11. The injury cannot be merely speculative. *Id.* An injury that is borne by the population in general, and which does not affect the plaintiff in particular, is not sufficient to confer standing. *Id.*

{¶ 60} To show standing, a private litigant:

> "[M]ust generally show that he or she has suffered or is threatened with direct and concrete injury in a manner or degree different from that suffered by the public in general, that the law in question has caused the injury, and that the relief requested will redress the injury."

*Bowers v. Ohio State Dental Bd.,* 142 Ohio App.3d 376, 380 (10th Dist.2001), quoting *State ex rel. Ohio Academy of Trial Lawyers v. Sheward,* 86 Ohio St.3d 451, 469-70 (1999).

{¶ 61} The magistrate finds helpful *City of Olmsted Falls v. Jones,* 152 Ohio App.3d 282, 2003-Ohio-1512, a case cited by the respondents.

{¶ 62} In *Olmsted Falls,* the city of Olmsted Falls ("city") challenged a decision of the Ohio Environmental Protection Agency ("OEPA") on grounds that it exceeded the agency's authority under Ohio and Federal law. *Id.* at ¶ 2. The Environmental Review

Appeals Commission ("ERAC") agreed with the city.  On appeal, this court concluded the city lacked standing to challenge the decision and, thus, reversed ERAC's decision.

{¶ 63} In finding that the city lacks standing, this court rejected the notion that the city's proximity to the site of the environmental impact sufficed to show injury:

> The stipulated facts indicate that Olmsted Falls is a city located approximately 2.2 miles southwest of Cleveland Hopkins International Airport. However, being a city within close proximity of the airport is not a concrete or specific injury as required to demonstrate standing. Proximity is only a factor when coupled with a threatened or actual injury. *Temple v. Schregardus* (May 27, 1999), Franklin App. No. 98AP-650, 1999 Ohio App. LEXIS 2373. The evidence only provides that the land and water will be affected but does not demonstrate the effect on Olmsted Falls.

*Id.* at ¶ 29.

{¶ 64} Furthermore, this court noted that "if a threatened injury is alleged, the party must demonstrate a realistic danger arising from the challenged action."  *Id.* at ¶ 21.

{¶ 65} The magistrate also finds helpful *Ogden Projects v. New Morgan Landfill Co.,* 911 F.Supp. 863 (E.D.Pa.1996), a case also cited and discussed by the respondents.

{¶ 66} In the *Ogden Projects* case, the plaintiffs, Ogden Projects, Inc., Ogden Martin Systems of Lancaster, Inc., John Snyder, and Jeffrey R. Horowitz brought an action against New Morgan Landfill Company, Inc. ("New Morgan Landfill").  The two corporate plaintiffs and the two individual plaintiffs (Snyder and Horowitz) alleged that New Morgan Landfill constructed and continues to operate a solid waste landfill in Berks County, Pennsylvania without the requisite Clean Air Act ("CAA") permit.

{¶ 67} Finding that the individual plaintiffs lacked standing, the court explains:

> To satisfy the first constitutional element of standing, injury in fact, a plaintiff must prove his injury to be "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.' " *Lujan,* 504 U.S. at 560, 112 S.CT. at 2136 (*citations omitted*). We believe the Individual Plaintiffs here have not made such a showing.
>
> The Individual Plaintiffs base their alleged injuries on the following facts. Plaintiff John Snyder resides approximately 25 miles from the Morgantown Landfill and utilizes the

recreational resources of Lancaster and Berks counties with his young children. * * * In addition, Plaintiff's expert stated that the air quality in Berks County would have been better if Defendant complied with CAA Part D permitting requirements. * * * As a consequence, Plaintiff Snyder asserts that emissions from the Morgantown Landfill will diminish surrounding air quality and thereby adversely affect his health, environmental and recreational interests. * * *

Plaintiff Jeffrey Horowitz resides approximately 85 miles from the landfill. * * * Nonetheless, his residence still falls within the Northeast Ozone Transport Region, the same nonattainment region that the Morgantown Landfill falls within. * * * He bicycles, skis and regularly uses the outdoor recreational resources of northern New Jersey with the rest of his family. * * * Plaintiff Horowitz claims that given this he suffers anxiety over the impact of Morgantown Landfill emissions on his health. * * * Plaintiff's expert stated that such concerns are reasonable. * * * He is also concerned with the ecological health of the Great Swamp National Wildlife Refuge, a place where he regularly bicycles. * * * Plaintiff's expert testified that elevated levels of ozone negatively impact such ecosystems and degrade the aesthetic appeal of the sky. * * * The expert did not state the amount of ozone necessary to create such effects.

The Supreme Court has long recognized that injury to a plaintiff's health, environmental, recreational or aesthetic interests constitutes the type of injury sufficient to confer standing. [*Sierra Club v. Morton,* 405 U.S. 727, 734.] Nonetheless, we believe the Individual Plaintiffs fall short of establishing that their alleged injuries are sufficiently concrete to satisfy the first prong of the standing test. The Individual Plaintiffs offer no evidence regarding the magnitude of the diminished air quality nor the specific direct effect, if any, that this diminished air quality will have on their health, environmental and recreational interests. From the fact that the air quality in the geographical area surrounding the landfill would have been better had Defendant obtained a Part D permit, Individual Plaintiffs summarily conclude that their health, environmental and recreational interests suffer injury, without filling in the blanks.

*Id.* at 869-70.

## Analysis:  Traditional Standing

{¶ 68} Examining the allegations of the complaint, as well as the affidavits of Cheryl Mshar, Hattie Wilkins, David Barton Castle and Bobbie Sue Castle, it is clear that the relators have not alleged in their complaint, nor shown by affidavits, an injury that is concrete and not speculative.  Moreover, relators have failed to show that their alleged injuries are different from that suffered by the public in general.

{¶ 69} In her affidavit executed December 30, 2014, Cheryl Mshar avers that her home is located .82 of a mile from the Ground Tech facility located at Youngstown, Ohio.  She avers that she has read the Ground Tech application for its March 6, 2014 chief's order.  Based on what she has read, Mshar concludes that the drilling wastes handled by Ground Tech at the facility "will be at least as contaminated, if not more, with chemicals and radiation as they are when generated during horizontal hydraulic fracking operations."  (Affidavit, ¶ 4.)

{¶ 70} Mshar further avers that on a "near-daily basis" she sees "trucks with large rolloff tanks, and tank trucks, coming to and from" the Ground Tech facility.  (Affidavit, ¶ 15.)  She avers that she "can smell hydrocarbon stenches from the plant, a smell [she] first noticed in 2014 after the company received its Chief's Order."  (Affidavit, ¶ 15.)

{¶ 71} Mshar states in her affidavit that she is opposed to hydraulic fracturing because it "threatens our water supplies and our air with pollution by toxic chemicals and radiation * * *."

{¶ 72} At paragraph seven of her affidavit, Mshar avers:

> Living close by IWC/Ground Tech, I believe that my family, friends, and I are being involuntarily exposed to, and are breathing, chemically-polluted and radon-polluted air emitted from fracking waste delivered to or held at the facility as a part of routine operations. I believe that my family, friends and I will be [sic] continue to be involuntarily exposed to chemical and radioactive air pollution, and will have to breathe such in the event there are waste spills from trucks traveling to and from IWC/Ground Tech on streets closer to my home than the IWC/Ground Tech facility. I also believe that my family, friends and I will be involuntarily exposed to chemical and radioactive contamination, both airborne and waterborne, in the event of a spill into the Mahoning River, which runs near the facility and near my home.

{¶ 73} In her affidavit executed January 5, 2015, Hattie Wilkins avers that she lives on Fairmont Avenue in Youngstown, Ohio and that her home is located .74 of a mile from the Ground Tech facility.

{¶ 74} Like Mshar, Wilkins also avers that she has read the Ground Tech application for the chief's order. Likewise, she concludes that the drilling wastes handled by Ground Tech will be contaminated with chemicals and radiation.

{¶ 75} Wilkins also opposes hydraulic fracturing for essentially the same reasons as does Mshar.

{¶ 76} At paragraph six of her affidavit, Wilkins makes the statement identical to the one made by Mshar at paragraph seven of her affidavit and as quoted above. That is, Wilkins believes that her family and friends and herself are being exposed to polluted air and water from the Ground Tech facility.

{¶ 77} In their affidavit executed January 10, 2015, David Barton Castle and Bobbie Sue Castle ("the Castles") aver that their home on North Chestnut Street in Barnesville, Ohio is about 1.7 miles south of the proposed EnerGreen facility.

{¶ 78} The Castles aver that, having read the EnerGreen application they "are very concerned for [their] health and that of [their] family members in the Barnesville area." (Affidavit, ¶ 4.)

{¶ 79} At paragraph five of their affidavit, the Castles conclude:

> We are concerned that chemicals used to extract oil and gas from shale during hydraulic fracturing (called "fracking") will contaminate the drilling wastes at EnerGreen, and that various chemical poisons will become airborne and be breathed by us and members of our family who live, work and conduct business in and around Barnesville.

{¶ 80} At paragraph seven of the affidavit, the Castles aver:

> In the past several years we have observed the spread of horizontal hydraulic fracturing for oil and gas in the vicinity of Barnesville. We are familiar with the industrial chemical odors and taste in the mouth from driving in areas where fracking wells are being developed. We've seen flaring wells and breathed the toxic air downwind from them in the vicinity of Barnesville.

{¶ 81} At paragraph nine of the affidavit, the Castles endeavor to further examine the EnerGreen "application for the Chief's Order in this case."  They conclude that:

> [F]racking waste will be mixed with coal ash and the resulting blend will be dumped in a place with no liners, no monitoring wells, no leachate collection systems - in short, without any of the features one might find in a licensed landfill.

{¶ 82} Significantly, the Castles do not explain the inference that they hold expertise in this matter.  The inference of expertise is further made when the Castles state:  "We see nothing in their application that suggests the heavy metals or mercury or concentrated radiation in coal ash will be neutralized, removed or rendered nondangerous."

{¶ 83} Again, seemingly relying upon unspecified expertise, the Castles conclude that EnerGreen will fail to follow a practice called "daily cover" and thus, radiation will move "into water supplies."  The Castles also conclude that the lack of daily cover "will allow radon gas to freely escape from the pile."

{¶ 84} At paragraph ten of the affidavit, the Castles state that they are "concerned that the wind and water will deposit toxic and radioactive materials throughout Barnesville and into the Barnesville Reservoir which is south of town."

{¶ 85} At paragraph 11 of their affidavit, the Castles refer to their "investigation," which they aver led them to conclude that the situation in Ohio is worse than in Pennsylvania regarding the control of "radioactive fracking wastes."  That the Castles conducted their own "investigation" which they failed to detail or explain cannot bestow court recognized expertise that might legitimize their conclusions.

{¶ 86} At paragraph 12 of the affidavit, the Castles assert that the EnerGreen application provides "no disclosure" of items that the Castles deem significant.  Again, there is no expertise to support the Castles' conclusion.  The same problem occurs at paragraphs 13, 14, and 15 of their affidavit.

{¶ 87} In their April 28, 2015 memorandum in opposition to relator's motion for summary judgment, respondents Zehringer and Chief Simmers address the lack of expert opinion to support standing:

Relators lack a site-specific evidence based on an analysis of data by an expert. In fact, Relators have no site-specific evidence of the alleged harms or how those harms are caused because the facilities are operating pursuant to Chief's orders rather than through a permit issued pursuant to the rules they seek to compel. While the Verified Complaint attempts to support the Relators' allegation by attaching a general slide show concerning the alleged risks concerning radioactivity of oil and gas drilling wastes from hydraulic fracturing, the slide presentation is not a site specific analysis of the facilities at issue in this case and certainly fails to establish a nexus to the harms about which the individual members speculate. * * *

Additionally, the slide presentation document was not authenticated and the author of the slide presentation provided no sworn testimony or otherwise that might support the court giving any weight to the generalized contentions in the slide presentation. Given that this hearsay evidence is not appropriate for consideration in support [of] summary judgment motion, it should be disregarded. *See* Civ.R. 56(C) (limiting evidence properly considered on a summary judgment motion to "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact"). But even if the slideshow were admissible, Relators have presented no evidence that the risks alleged in the slide show are the same risks presented by the wells near which the identified members live. The Relators simply speculate in their attempt to confer standing.

* * *

[I]n the present case, there is no site-specific evidentiary support or expert testimony to prove that the harms alleged are actually occurring, or that there is even a risk that they will.

(ODNR's Memorandum in Opposition, 21-23.)

{¶ 88} Significantly, the relators fail to respond to the above-quoted challenge to their evidence or lack thereof in support of standing. See Relators' May 22, 2015 Memorandum Contra the Motion of Respondents Simmers and Zehringer for Summary Judgment. The magistrate agrees with respondents' analysis.

{¶ 89} The Castles' affidavit endeavors to create an inference of expertise that does not exist. The Castles' affidavit presents no evidence that the Castles have the scientific expertise to support their claims that they are being injured or that an injury is being threatened by the EnerGreen facility located an alleged 1.7 miles from their home in Barnesville, Ohio.

{¶ 90} Returning to the affidavit of Cheryl Mshar, there is no expert opinion or evidence to support the inference that the so-called "hydrocarbon stenches" that she allegedly has smelled since 2014 are in fact causing her harm or injury.

{¶ 91} Likewise, that Mshar has read the Ground Tech application does not confer on her the competency to render an expert opinion on whether the drilling wastes handled by Ground Tech at the facility will be contaminated with chemicals and radiation that have injured her or that threaten injury to her.

{¶ 92} Furthermore, Mshar's belief that her, her family and friends will be exposed to toxic substances from the Ground Tech facility is not evidence of a concrete injury. At best, it is speculation that is not evidence of an injury or harm.

{¶ 93} Returning to the affidavit of Hattie Wilkins, there is no expert opinion or evidence to support an inference that the drilling wastes handled at the Ground Tech facility has caused her injury or threatens injury. Also, Wilkin's belief that herself, her family and friends are being injured or will be injured fails to show a concrete injury. At best, it is speculative and not evidence of an injury or harm.

{¶ 94} Accordingly, based upon the foregoing analysis, the magistrate concludes that relators have failed to show that they have traditional standing to bring this action.

### Analysis: Public-Right Standing

{¶ 95} The public-right doctrine presents "an exception to the personal-injury requirement of standing." *Sheward* at 503. The doctrine provides that "when the issues sought to be litigated are of great importance and interest to the public, they may be resolved in a form of action that involves no rights or obligations peculiar to named parties." *Id.* at 471. To succeed in bringing a public-right case, a litigant must allege "*rare and extraordinary*" issues that threaten serious public injury. (Emphasis sic.) *Id.*

at 504.  Not all allegedly illegal or unconstitutional government actions rise to this level of importance.  *Id.* at 503.

{¶ 96} As stated by the plurality opinion in *ProgressOhio.org, Inc.*:  "*Sheward* was a deeply divided, four-to-three decision, and it remains controversial today."  *Id.* at ¶ 13.

{¶ 97} Recently, the Supreme Court of Ohio refused to find public-right standing in *State ex rel. Leslie v. Ohio Hous. Fin. Agency,* 105 Ohio St.3d 261, 2005-Ohio-1508. (Constitutional challenge to state spending measures was "not a 'rare and extraordinary case' warranting invocation of the public-right exception to the personal-stake requirement of standing.")  *ProgressOhio.org, Inc.* at ¶ 12.

{¶ 98} In *Walgate,* this court denied public-right standing because the legislation under challenge "is not of the same magnitude as that presented in *Sheward,* which concerned separation of powers and the ability of the Ohio legislature to re-enact legislation expressly prohibited by the judiciary."  *Walgate* at ¶ 32.

{¶ 99} Here, in their motion for summary judgment (and memorandum in support filed February 27, 2015), relators summarize their argument as to why they believe that they have presented a case for public-right standing:

> In the instant matter, the deliberate failure by Respondents to promulgate regulations which would impose constraints and regulatory insight on the issuance of Chief's Orders has allowed the imposition of no fewer than 23 potentially or actually polluting industrial facilities upon the physical environment in many Ohio counties, with unknown but very possible effects on the public health of Ohio's citizens.

(Relators' Summary Judgment Motion, 35.)

{¶ 100}        Based upon the foregoing, it is clear that, applying the holding in *Walgate,* relators do not have public-right standing.


### Taxpayer Standing

{¶ 101}        As respondents Zehringer and Chief Simmers point out in their April 28, 2015 memorandum in opposition to relators' motion for summary judgment, relators allege in their complaint that Mshar, Wilkins, and the Castles are each Ohio taxpayers who object to the failure of Chief Simmers to promulgate rules.  Respondents

Zehringer and Chief Simmers argue that Mshar, Wilkins, and the Castles do not have taxpayer standing to bring this action.  (Memorandum, 28-30.)

{¶ 102}        Likewise, the intervenors argue in their March 12, 2015 motion for summary judgment and response to relators' motion for summary judgment that relators lack standing as taxpayers.   (Intervenors' Memorandum, 27-29.)

{¶ 103}        In their April 28, 2015 memorandum in opposition to the intervenors' motion for summary judgment, relators do not address taxpayer standing.

{¶ 104}        In their motion for summary judgment filed on February 27, 2015, relators do not claim or argue for taxpayer standing.

{¶ 105}        Moreover, in their motion to dismiss filed December 23, 2014, the four respondents argue that relators lack taxpayer standing.  (Motion to Dismiss, 16-20.)  However, in their January 12, 2015 memorandum contra the respondents' motion to dismiss, relators do not claim taxpayer standing nor do they respond to the respondents' argument for lack of taxpayer standing.

{¶ 106} It can be observed that, in their affidavits, Cheryl Mshar and Hattie Wilkins each aver that they are "an Ohio taxpayer, paying property, income and sales taxes."  It can be further observed that the Castles fail to make a similar averment regarding their taxpayer status in their affidavit.

{¶ 107} Consequently, given the above-described scenario regarding taxpayer standing arguments or the lack thereof, the magistrate concludes that relators have failed to pursue any claim to taxpayer standing that may have been initially raised in the complaint.

{¶ 108} Accordingly, based upon relators' apparent waiver to any claim to taxpayer standing, the magistrate concludes that relators have not shown standing as taxpayers.

## Conclusion

{¶ 109}  Summary judgment is appropriate when the movant demonstrates that: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary

judgment is made, said party being entitled to have the evidence construed most strongly in his favor. *Turner v. Turner*, 67 Ohio St.3d 337, 339-40 (1993); *Bostic v. Connor*, 37 Ohio St.3d 144, 146 (1988); *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66 (1978). The moving party bears the burden of proving no genuine issue of material fact exists. *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 115 (1988).

{¶ 110} It is well settled that, in order for a writ of mandamus to issue, relator must demonstrate: (1) he has a clear legal right to the relief prayed for; (2) the respondent is under a clear legal duty to perform the act; and (3) relator has no plain and adequate remedy in the ordinary course of the law. *State ex rel. Berger v. McMonagle*, 6 Ohio St.3d 28 (1983).

{¶ 111} Accordingly, based upon the foregoing, it is the magistrate's decision that this court deny relators' February 27, 2015 motion for summary judgment, grant the intervenors' March 12, 2015 motion for summary judgment, and grant the respondents' April 28, 2015 motions for summary judgment. The respondents' December 23, 2014 motion to dismiss is thereby rendered moot.

/S/ MAGISTRATE
KENNETH W. MACKE

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).